NOT DESIGNATED FOR PUBLICATION

No. 123,461

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Gove District Court; BLAKE A. BITTEL, judge. Opinion filed June 11, 2021. Appeal dismissed.

*Carol M. Park*, of Schwartz & Park, L.L.P., of Hays, for appellant natural mother.

*Olavee F. Raub*, of Raub & Zeigler, LLC, of Ellis, for appellee paternal grandfather.

Before GREEN, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: Mother appeals from a temporary custody order entered in a child in need of care (CINC) proceeding. Mother argues that insufficient evidence supported the district court's granting the temporary custody order and placing her daughter, D.H., with the child's paternal grandfather (Grandfather). Mother also complains that the district court violated her due process rights by allowing undue delay in the proceedings. However, because the district court has since issued orders of adjudication and disposition in this case, any issues related to the temporary custody order are moot. Because the issues raised here do not fall under an exception to the mootness doctrine, we decline to consider the merits of Mother's appeal and dismiss the appeal as moot.

FACTS

*Procedural History*

This is the third CINC case involving D.H. (born in 2007). The State filed the first case in 2008, alleging that D.H.'s father, P.H. (Father), and Mother were unable to care for her due to their difficulty controlling their inappropriate behaviors, including a recent domestic violence incident. D.H. was placed with Grandfather. Father progressed on his case plan tasks, but Mother did not. Ultimately, in a separately filed domestic case, the district court determined that Father should have custody of D.H. and Mother should have one hour of supervised visits or phone time every week. The district court subsequently dismissed the CINC case concerning D.H.

Mother moved to Illinois in June 2009. She had almost no contact with D.H. in the years after her move.

The State filed a second CINC petition in June 2018 after Father committed suicide. D.H. was present when Father shot himself in their home. The district court determined that D.H. was a child in need of care, and Mother appealed. In October 2019, a panel of our court issued a decision reversing the district court, "set[ting] aside the adjudication and remand[ing] the matter to the district court with directions to dismiss the CINC proceeding, restore legal custody to Mother, and give Mother physical custody of D.H." *In re D.H.*, 57 Kan. App. 2d 421, 453 P.3d 870 (2019), *rev. denied* 311 Kan. 1046 (2020).

This court issued a mandate in this second case on March 5, 2020, directing execution of its decision. D.H. lived with Grandfather while the second CINC case was being adjudicated. After receiving the mandate from the Court of Appeals, Grandfather

and Mother agreed that Grandfather would maintain physical custody of D.H. until March 20, 2020, at which time Mother would take D.H. to Illinois.

On March 10, 2020, five days after the mandate in the second case, Grandfather filed a private CINC petition. In this third petition, Grandfather alleged that D.H. was in need of care. Specifically, Grandfather alleged that while the previous CINC case was pending before our court, "a number of concerns arose" that Mother had abused and neglected D.H. He asserted that Mother had made "minimal progress, if any" during monthly therapy sessions that had been ongoing for 18 months. Grandfather was concerned that Mother brought up inappropriate topics, such as Father's suicide, during telephone calls and therapy sessions. Despite the increased contact, Mother and D.H. had not formed a connection and their weekly phone calls usually lasted only three to five minutes. Grandfather believed Mother neglected D.H.'s safety and well-being by exposing her to a registered sex offender with whom she was in a relationship. He asserted that Mother should be prevented from taking custody of D.H. because of her history of abuse and neglect.

Following the filing of Grandfather's petition, the district court issued an ex parte order of protective custody, and the Kansas Department for Children and Families (DCF) placed D.H. with Grandfather.

The parties appeared for a temporary custody hearing on March 11, 2020. However, the hearing was only set for 30 minutes, which proved insufficient to hear the evidence. Grandfather did provide some testimony, but when he began answering a question about information D.H. shared with him Mother's counsel objected on hearsay grounds. Grandfather's counsel requested a continuance to make D.H. available. Mother argued that good cause did not exist for the continuance, noting that Grandfather knew there would be a hearing on temporary custody and that he had a chance to gather his witnesses. Further, Mother traveled from Illinois to be present for the hearing. The

3

district court suggested continuing with evidence that was not hearsay and readdressing the motion to continue later. Soon after, the guardian ad litem also requested a continuance. He said that he had not expected the hearing to take so long and that he was scheduled to be in another city that afternoon. The district court judge said his docket was full for the afternoon and he was considering continuing the hearing. Mother again objected to the continuance, saying she was present and ready to proceed. The court overruled this objection and continued the hearing to the next day.

On the morning of the following day, March 12, 2020, prior to the temporary custody hearing, Mother filed a motion to dismiss the petition. She asserted that she had never had a chance to parent D.H. and the court should not make assumptions about what her behavior would be if she were permitted to exercise her parental rights. At the hearing later that day, Mother informed the court that she had filed the motion and that if the court agreed with the claims in Mother's motion then it would be without jurisdiction to enter a temporary custody order as to D.H. She wanted the court to address this "threshold matter" before ruling on temporary custody of D.H.

The district court said that it could either conduct the hearing before ruling on the motion with the knowledge that any orders may be vacated after considering the motion, or it could rule on the motion and any responses to it before conducting the temporary custody hearing. After discussing the options with her attorney, Mother elected to continue the temporary custody hearing to allow the court time to consider the motion to dismiss. The court ruled that any response to the motion must be submitted by March 23, 2020.

Grandfather's counsel moved for an extension of time to reply to Mother's motion to dismiss on March 19, 2020. The motion explained that Grandfather's primary attorney was hospitalized by illness. The motion did not request a specific amount of time for the extension. The court granted the motion the same day, extending the time to respond to

"said time when [Grandfather's counsel] can return to work and file [Grandfather's] response." Grandfather responded on April 16, 2020. Mother replied one week later.

Following the April submissions by the parties arguing the motion to dismiss, the district court did not issue a decision on the motion until July 23, 2020. The district court granted the motion in part on an issue preclusion basis but allowed Grandfather to proceed to the hearing with certain limitations. The district court denied the motion as it pertained to failure to state a claim.

The parties appeared for a status hearing several days later. Both parties estimated it would take one day to conduct the temporary custody hearing, but they did not decide the date upon which it would occur.

*Temporary Custody Hearing*

The temporary custody hearing finally began on September 14, 2020. There is nothing in the record explaining the delay between the district court's ruling on the motion to dismiss and the temporary custody hearing. The court was unable to hear all of the evidence the day of the hearing, so it scheduled a second day of testimony on September 22, 2020. When the trial still could not be completed on the second day, it was scheduled for a third day on November 2, 2020.

At the point in time we are considering this appeal, it serves no purpose whatsoever to give an exhaustive rendition of the evidence presented to the district court at the temporary custody hearing. And considering that the hearing sprawled over three separate days on the district court's docket and involved numerous witnesses, it is an understatement to note that the evidence was extensive and the issues were hotly contested. As discussed below, because adjudication and disposition of this CINC case have already occurred, we have determined that the issues before us bearing on

temporary custody are completely and utterly moot. For this reason, and to provide context, we will provide only a substantially abbreviated summary of the proceedings before the district court at the hearing.

At the time of the temporary custody hearing, Mother was living in Illinois with her fiancé and her 11-year-old autistic son J.Z. Mother explained that she never moved back to Kansas because it was too expensive and because she had a network of services established in Illinois for herself and J.Z.

Most of the evidence at the temporary custody hearing focused on the time between the filing of the second CINC petition in June 2018 and the temporary custody hearing. During this time period, Mother's contact with D.H. was largely limited to very short weekly telephone calls, usually ended by D.H. Although Mother worked with the St. Francis case team to develop ideas on how to get D.H. to engage, she was unable to encourage the conversation and make it more than cursory.

Mother also had occasional in-person visits with D.H. in Kansas. St. Francis would try to schedule these visits whenever Mother was in Kansas for court or therapy. She had two supervised visits with D.H., one in June 2018 and another in August 2018.

Mother was permitted to take D.H. to Illinois for Thanksgiving in November 2018, over the objections of D.H.'s therapist, though D.H. expressed fears about the visit. D.H. told Mother during a phone call that she did not want to visit her, stating: "'I don't want to be with someone I don't love. You had your chance and you blew it.'" Yet the visit occurred as planned. On the trip back to Kansas, Mother stopped in Salina and picked up her boyfriend who was a registered sex offender and had not passed a background check. Grandfather testified that after D.H. returned from the Thanksgiving trip, she was defiant, had trouble returning to her routine, and missed assignments in school.

6

Because of Mother's relationship with a registered sex offender, her visits with D.H. reverted to supervised visits. Despite its impact on her visits with D.H., Mother continued her relationship with the sex offender until March 2019. Shortly thereafter she entered into a relationship with another man and became engaged. Her fiancé had three children, although he did not have a relationship with any of them. He forfeited his rights to two of the children and, at the time of the trial, was considering taking action to obtain parenting rights over the third child.

Mother's visits with D.H. progressed to monitored visits in March 2019. These visits occurred at St. Francis or in the Hays community. A planned visit by D.H. to visit Mother in Illinois, which was to be preceded by a day visit in Kansas, was canceled because of Mother's car trouble. When the overnight occurred a month later, interaction between D.H. and Mother was so negative that further overnight visits were canceled. In fact, professionals who observed D.H. and Mother during the time after the second CINC case felt that there was little overall improvement in their relationship throughout the third case.

D.H.'s counselor, who had 49 appointments with her, testified that it would be detrimental to D.H. to remove her from Grandfather and that removal would create an even bigger wedge between her and Mother. The counselor was concerned about D.H.'s well-being if D.H. went to live with Mother. She explained that when D.H. learned she would have to leave Grandfather to live with Mother, she had a significant emotional reaction and was very anxious. D.H. asked the counselor who would take care of her at Mother's and said she would rather go to foster care than live with Mother. D.H. also wondered why Mother would allow her to be around a sex offender and whether Mother would prioritize J.Z. over her.

D.H.'s counselor did not believe Mother had made any progress in addressing those worries as of the date of the hearing. She believed this was because D.H. did not

have any reassurance that Mother would take care of her. The counselor concluded that her concern about D.H. being placed in Mother's custody eclipsed the concern she would have for someone who was merely a willful 12-year-old because D.H. was fearful and made it very clear that she would do whatever it took not to live with Mother.

At the hearing, Mother said she thought the counselor was not objective and that she had sided with Grandfather. Mother thought that "everything in therapy [got] pointed back at [her], what [she's] done wrong in the past and it's been brought up." She believed the therapist did not push D.H. towards reintegration. Mother also thought the counselor was trying cast her as "the bad guy in the situation."

Mother and D.H. also attended family therapy with a licensed specialist clinical social worker for three sessions. D.H. told the social worker that she did not believe Mother could meet her needs, but the social worker believed that Mother was responding to D.H.'s concerns, and the only barrier to the process of family therapy was D.H.'s resistance. The social worker thought D.H.'s behavior was normal preteen behavior and had no concerns with Mother obtaining custody of D.H. She did not think their issues needed to be resolved before D.H. could live with Mother.

D.H. had diagnoses for chronic posttraumatic stress disorder (PTSD) and unspecified ADHD. Mother knew that D.H. had a diagnosis for PTSD because it was mentioned in a family therapy session, but "[o]ther than that [she had] not been told." During the hearing, Mother said she did not know what medications D.H. took because she "wasn't told," and she also did not know who D.H.'s doctors were.

Mother had diagnoses for bipolar affective disorder, generalized anxiety disorder, PTSD, and depressive disorder. At one point, Mother was taking prescribed medication for pain management and mental health issues but was no longer doing so because of reactions to the medicine she experienced. Mother testified that her mental health

8

therapist had seen no safety concerns that would require Mother resuming the mental health medication.

A September 2020 court report prepared before the temporary custody hearing noted that "[t]he relationship between [D.H.] and [Mother] has not improved and [D.H.] continues to resist any opportunity to build a relationship." It confirmed that Mother completed all her assigned tasks. Mother had also spoken with a school representative and someone with her local community health center to ensure that services could be established for D.H. if D.H. moved to Illinois. The report concluded:  "[St. Francis] feels that due to the nature of this case, that a recommendation cannot be made on the part of the case team beyond requesting in person visits and family therapy continue to occur between [Mother] and [D.H.]."

*District Court Decision*

Following the hearing, the district court ordered temporary custody of D.H. to remain with DCF and placed D.H. with Grandfather. The court's findings provided:

> "3.   The court finds there is probable cause to believe that the allegations in the Petition are true. Appropriate public or private agencies have made reasonable efforts but have failed to maintain the family and prevent immediate temporary custody being place[d] with the natural mother. Additionally, reasonable efforts are not required because an emergency exists which threatens the safety of the child. The child has been in the temporary custody [of] the Secretary and DCF, placed with paternal grandfather. According to testimony, and specifically testimony of the minor child's therapist, immediate removal from current placement would threaten the health or welfare of the child.
>
> "4.   The court further finds that the child is likely to sustain harm if temporary custody were to be given immediately to the natural mother and immediate return would be contrary to the welfare of the child. Continued temporary placement with the grandfather is in the best interest of the child at this time."

Mother appealed from the district court's journal entry and order of temporary custody. Following her notice of appeal, in January 2020, the district court filed a journal entry and orders of adjudication and disposition finding clear and convincing evidence that D.H. had been physically, mentally, or emotionally abused or neglected and was a child in need of care. The court ordered custody of D.H. to remain with the State and recommended continued placement with Grandfather.

ANALYSIS

Since this appeal is solely from the district court's temporary custody orders, which have now been superseded by both an adjudication that D.H. is a child in need of care and on orders of disposition, our first line of inquiry must determine whether Mother's appeal is moot.

"A case is moot when a justiciable controversy no longer exists. 'A justiciable controversy has definite and concrete issues between the parties and "adverse legal interests that are immediate, real, and amenable to conclusive relief."' [Citations omitted.]" *In re A.E.S.*, 48 Kan. App. 2d 761, 764, 298 P.3d 386 (2013). Kansas courts generally do not decide moot questions or render advisory opinions. 48 Kan. App. 2d at 764. Mother acknowledges that her appeal from the temporary custody order became moot when the district court adjudicated D.H. a child in need of care. See 48 Kan. App. 2d 761, Syl. ¶ 3. However, she argues that an exception to the mootness doctrine applies.

The mootness doctrine is not jurisdictional, so it is subject to exceptions. Under one of these exceptions, an appellate court will review a moot issue if it is capable of repetition and raises concerns of public importance. "Public importance means 'something more than that the individual members of the public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their

10

individual rights or serve as a guide for their future conduct as individuals.' [Citations omitted.]" 48 Kan. App. 2d at 766. Mother argues that this exception applies here.

A panel of our court examined the exception to mootness in *In re A.E.S.*, another case in which a parent, M.S., appealed from a temporary custody order in a CINC proceeding. Just as in our case, the district court entered orders of adjudication and disposition while the appeal was pending. Our court held that M.S.'s appeal of the temporary custody order was rendered moot by the district court's adjudication and disposition orders. 48 Kan. App. 2d at 766. It declined to consider M.S.'s arguments on the sufficiency of the evidence under an exception to the mootness doctrine because the order of disposition concluded the evidentiary issues. The court stated: "Any further consideration of such issues would be case specific and would not implicate any exception to the mootness doctrine. Such consideration would simply result in an advisory opinion which we decline to render." 48 Kan. App. 2d at 766. The court did, however, agree to consider M.S.'s constitutional challenge to the statute governing the temporary orders procedure because "the constitutionality of the temporary order statute is a matter of public importance." 48 Kan. App. 2d at 767.

Other panels of our court have applied the holding of *In re A.E.S.* to appeals from temporary custody orders. See *In re N.M.*, No. 118,652, 2018 WL 2749803, at *3 (Kan. App. 2018) (unpublished opinion) (declining to address moot appeal which challenged sufficiency of evidence supporting temporary custody order); *In re A.G.*, No. 114,297, 2016 WL 1616790, at *1 (Kan. App. 2016) (unpublished opinion) (considering moot appeal from temporary custody order because district court issuing order had long tradition of declaring that emergency existed if parents did not have their own residence and district court's application of that policy was capable of repetition but evaded review).

Mother makes three arguments here. One is a challenge to the sufficiency of the evidence supporting the district court's temporary custody order. The other two arguments are related, with Mother arguing that the district court did not have good cause to continue the temporary custody hearing and that its delay in conducting the temporary custody hearing violated her due process rights. None of these arguments fall under the exception for issues that are capable of repetition and raise concern of public importance because they are all closely tied to the facts of the case. Any opinion we might give on those issues would affect only Mother and the other interested parties in the case. Mother does not challenge the constitutionality of a law that applies to the public, as in *In re A.E.S.* Instead, her constitutional challenge is to the unique procedures the district court employed in this individual case. The issues are fact specific, and the applicable law is addressed by other cases.

Under the circumstances, we find that none of the recognized exceptions to the mootness doctrine apply in this case. Because of the existence of district court orders of adjudication and disposition concerning D.H., we find that Mother's appeal is moot and must be dismissed.

Appeal dismissed.